IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| Desa Ballard, as Successor Trustee of the Trust of Chris Combis, u/a/d 10-15-2013, | ) ) ) | C/A: 0:14-1839-JFA |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| Diane Combis, | ) ) | |
| Defendant. | ) ) | |
| ———————————————— | ) ) | |
| Desa Ballard, as Successor Trustee of the Trust of Chris Combis, | ) ) ) | |
| Cross-claim Plaintiff, | ) ) | **FINDINGS OF FACT AND** |
| v. | ) ) | **CONCLUSIONS OF LAW** |
| George Combis; and Diane Combis, as former Trustee of the Trust of Chris Combis, | ) ) ) | **AND ORDER** |
| Cross-claim Defendants. | ) ) | |
| ———————————————— | ) ) | |
| In the Matter of the Estate of Chris Combis: | ) ) | |
| Desa Ballard, as Personal Representative of the Estate of Chris Combis, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | |
| George Combis; Chris A. Combis; Diane Combis; and Superior Tile, Marble, and Terrazzo Corporation, | ) ) ) ) | |
| Respondents. | ) ) | |
| ———————————————— | ) | |

1

Linda Combis and Mary Combis,                    )
                                                 )
                    Plaintiffs,                  )
                                                 )
v.                                               )
                                                 )
George Combis and Diane Combis                   )
(Individually and as former Trustee of the       )
Revocable Trust Agreement for Chris              )
Combis),                                         )
                                                 )
                    Defendants.                  )
_____          )

## I.    INTRODUCTION AND PROCEDURAL BACKGROUND

These four consolidated cases all pertain to a dispute between siblings regarding financial transactions involving their father. At the Court's suggestion, the parties consented to a bench trial due to the complexity of the factual and legal issues presented.

The Court received testimony in a five-day trial, heard extensive closing argument, and took the matter under advisement. The Court then determined that it needed additional evidence on one issue and reopened the hearing for additional testimony. The Court also directed the attorneys to exchange and submit proposed findings and conclusions, some of which have been adopted in this Order.[1]

Before delving into the myriad of factual and legal issues presented in this case, the Court is compelled to make a few general observations. The four lawsuits resolved in this Order are but a portion of twelve lawsuits filed by the three adult children of Chris Combis

---

[1] Although the Court has adopted some of the submissions from each party, the final product represented by this Order constitutes the Court's own independent determination of the issues.

and his wife, Jessie Combis. As will be seen, the Combis family enjoyed considerable financial success in the decorative tile and stone business in Charlotte, North Carolina. Unfortunately, as is often the case with closely-held family corporations, the partners were better at their craft than they were with their corporate record-keeping. This lack of documentation, coupled with testimony regarding faded memories of financial transactions that occurred nearly a decade ago, is what prompted this Court to suggest the bench trial that commenced on July 12, 2016.

Having thus invited the family to drop this difficult and emotion-laden controversy into its lap,[2] the Court now proceeds to do its best to untangle and resolve the issues presented, with the observation that the failure to follow even rudimentary corporate formalities and reliance upon "home drawn" financial documents often sow the seeds of controversies that tax the ability of the legal system to achieve justice years later.

Chris Combis, referred to during the trial as "Pop" (to distinguish him from his grandson of the same name and who was a party at one time to one of these actions) was the patriarch of the family who formed and operated Superior Tile, Marble, and Terrazzo, Inc. ("Superior Tile") headquartered in Mecklenburg County, North Carolina. Eventually, Pop's son, George,[3] assumed a position with Superior Tile and, before Pop's death, took over ownership of the company.

---

[2] The case was mediated three times before three different mediators. All of these efforts were unsuccessful.

[3] For ease of reference, all parties agreed to refer to Chris Combis as "Pop" and the other family members by their first names. The Court will continue these references herein.

3

Among the projects for which Superior Tile provided stone and tile work were the Charlotte Panthers Stadium and the headquarters for Bank of America, both in Charlotte. At one point, George even bragged that it would be easier to produce a list of buildings in Charlotte that Superior Tile had *not* worked on than to provide a list of those for which the company *had* performed work. Suffice it to say that Superior Tile was a successful business enterprise.

George is married to Diane, with whom Pop had a close relationship. Pop also had two daughters, Linda and Mary, both of whom counted on Pop for much of their financial support.

Importantly, Pop and George did not maintain complete business records and constantly moved money around from the company to the various family members. Further, Pop eventually transferred ownership of Superior Tile to George. Additionally, George and Diane began a new company in Diane's name to take advantage of her status as a member of a minority. Thus, two corporate entities are involved in these actions.

Pop died on February 3, 2009, and, shortly thereafter, the harmony that had existed was gone and the litigation began.

As noted previously, the Court's fact-finding process has been made more difficult due to the lack of adequate documentation[4] for the disputed financial transactions as well as

---

[4] Except for corporate stock certificates which were ordered to be produced by the Court in mid-trial, not one corporate record was introduced as a trial exhibit. While the record is replete with documents such as hand-written letters and emails to Linda seeking to remove her from her house, or at least force her to make her mortgage payments, the Court was not provided with a single page of corporate board minutes, (continued...)

several witnesses' professed lack of memory regarding key events. "I don't recall" was a frequent response to many pertinent questions.

Regarding the documentation of transactions in the Trust Account, George and Diane produced a ledger sheet containing cryptic entries that are of little help. As to backup documentation, Diane, when pressed, frequently said, "I gave that to my lawyer." Such documentation was never produced at trial. The "lawyer" being referred to was one or more of the previous attorneys who have represented George and Diane during the course of their litigation. At one point during the trial, this Court interrupted the proceedings to inform Diane that merely incanting the phrase "I gave it to my [previous] lawyer" was not a substitute for producing relevant documents during discovery. Indeed, one of her previous attorneys, Charles Bridgmon ("Bridgmon"), testified for George and Diane at trial. For these reasons, the Court announced that, following the close of the trial testimony, the Court would keep the record open for an additional two days to allow the documents allegedly given to previous counsel to be retrieved from the attorneys and produced to this Court. No such documents were ever produced.

Additionally, George was occasionally less than forthcoming. For example, one issue in the case was the extent to which George contributed monies that went into a joint account with Pop. When pressed for documentation at his deposition (which deposition was

---

⁴(...continued)

corporate resolutions, or other documents that would help explain the various actions taken by Superior Tile, some of which are at the center of this litigation. Additionally, the Chris Combis Revocable Trust never filed any tax returns while Diane was Trustee.

published at trial), George responded, "Well, not being smart, I don't have to show anybody where it came from."

Finally, at times, George's trial testimony was internally inconsistent. When asked about what happened to the hotly disputed $412,000.00 that was allegedly loaned to him from the Trust managed by his wife, George testified (on the fourth day of trial) that approximately $150,000.00 of it was used for the benefit of his sister Linda, to wit:  a $60,000.00 horse barn; a $20,000.00 fence; a $63,000.00 Suburban; a $20,000.00 tractor; a $12,000.00 "Gator" all-terrain vehicle; and $15,000.00 worth of stone and tile. By the next morning of trial, however, George had retreated from this position and acknowledged on cross-examination that none of these items were purchased with the Trust monies, if they had been purchased at all.

One other threshold issue bears mention. Mindful of its obligation to police its own jurisdiction, this Court inquired of the parties whether any or all of the claims asserted in this action (which was removed to this Court on the basis of the diverse citizenship of the parties) should be dismissed because of the so-called "probate" exception to federal jurisdiction.

Counsel for Desa Ballard, the Personal Representative and Successor Trustee, argued, as she had since removal to this Court, that these cases belonged in state court. The two remaining groups of litigants, George and Diane, as well as Linda and Mary, suggested jurisdiction was proper in this federal Court.

For the reasons stated in open court, this Court determined that the ownership question for certain items of personal property (such as rare coins, antiques, firearms, and

watches) were probate court matters and, therefore, this Court declined to hear testimony regarding such personal property.[5]

All remaining claims, which distilled to their essence are contract-based claims between diverse parties, were held to be properly before this Court. At the risk of oversimplification, these claims are:

(1) The $230,000.00 Note;

(2) The $412,000.00 "Loan" and related Breach of Fiduciary Duty Claim;

(3) The $49,564.09 Missing Certificate of Deposit; and

(4) The Allocation of Desa Ballard's Fees as Trustee of the Trust.

After receiving the testimony, carefully considering all the evidence, weighing the credibility of the witnesses, reviewing the exhibits and briefs, and studying the applicable law, this Court makes the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52. The Court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

## II.    FINDINGS OF FACT

1. On March 11, 2003, Pop executed his last will and testament (the "Will") and established the Chris Combis Revocable Trust (the "Trust") under North Carolina law.

---

[5] In so holding, the Court relied upon and applied *Lee Graham Shopping Center v. Estate of Kirsch*, 777 F.3d 678 (4th Cir. 2015). *See also Stern v. Marshall*, 564 U.S. 462 (2011).

2. Pursuant to the Will, the property in his estate (the "Estate") at the time of his death would "pour-over" into his Trust.

3. Pop designated himself as the original Trustee of the Trust.

4. The Trust beneficiaries were his three adult children George, Mary, and Linda. All three children were officers of Superior Tile and, at various times, received money as salary or director's fees, although the record is not clear regarding these payments.

5. At the time Pop established the Trust, he owned one house (the "Lochridge House") located at 718 Lochridge Road in Charlotte, North Carolina. The Lochridge House was unencumbered by a mortgage.

6. In 2003, Pop purchased a house and real property (the "Horseshoe House") located at 9313 Horseshoe Circle in Fort Mill, South Carolina. Although Pop and George signed the mortgage for the Horseshoe House, George did not sign the note that required $1,289.56 per month payments.[6]

7. Mary resided in the Lochridge House from prior to the creation of the Trust until the house was sold in 2013. Title was never placed in her name.

8. Linda has resided in the Horseshoe House from the time Pop purchased it until the present day. Title was never placed in her name.

9. With the exception of one $1,289.56 mortgage payment made by Linda on the

---

[6] George Dep. p. 34.

Horseshoe House, neither sister has paid any consideration for their occupation of either house.

10. George has never resided in either the Horseshoe House or the Lochridge House.

11. On July 14, 2005, Pop and Superior Tile entered into a loan agreement (the "$230,000.00 Note"), under which Pop agreed to provide Superior Tile with the use of $230,000.00. In return, Pop received a note, obviously drafted by a non-lawyer, which reads as follows:

July 14, 2005

      RE:  Loan Agreement

This agreement is between CHRIS COMBIS and SUPERIOR TILE AND MARBLE CORPORATION.

CHRIS COMBIS agrees to loan SUPERIOR TILE AND MARBLE $230,000.00.

The terms and conditions are as follows:

1)      In exchange for the use of $230,000.00, SUPERIOR TILE AND MARBLE agrees to the following:

      a)      Pay interest quarterly at the rate of 7%.

      b)      For the life of the loan, SUPERIOR TILE AND MARBLE agrees to continue to pay MARY COMBIS and LINDA COMBIS a salary of $150.00 per week.

      c)      SUPERIOR TILE AND MARBLE agrees to pay the personal insurance for MARY COMBIS and LINDA COMBIS.

      d)      SUPERIOR TILE AND MARBLE agrees to pay the automobile insurance (one vehicle each) for MARY COMBIS and LINDA COMBIS.

This loan will be terminated 30 days after the death of CHRIS COMBIS and the monies will be put back in his estate.

      Accepted:      s/      CHRIS COMBIS

      SUPERIOR TILE & MARBLE CORPORATION

      Accepted:      s/ GEORGE C. COMBIS, President

12.    On April 21, 2006, Pop executed a First Amendment and Restatement of his Trust, replacing himself with Diane as Trustee. Both Linda and Mary consented to Diane's appointment.

13.    On or about the time of the naming of Diane as Trustee, Diane and Linda met with Paul Hattenhauer ("Hattenhauer"), the lawyer who drafted Pop's Will and the Trust, regarding Diane's duties as the new Trustee.  Hattenhauer also provided Diane with a book describing the duties and responsibilities of a trustee.

14.    George and Pop were co-owners with right of survivorship of a Wachovia Securities investment account (the "Joint Account").[7]  On April 30, 2006, the value of the funds held in the Joint Account was $387,590.14.

15.    During the month of April 2006, Pop withdrew the entirety of the funds held in the Joint Account without George's consent and exercised sole control over the funds.

16.    On September 11, 2006, Pop conveyed the Lochridge House into the Trust.

17.    On October 13, 2006, Pop conveyed the Horseshoe House into the Trust.

18.    On April 18, 2007, Pop filed a lawsuit against George, Diane, and Superior Tile claiming that Superior Tile was in breach of the $230,000.00 Note and prayed for the recovery of $230,000.00, together with interest.

19.    On July 27, 2007, Pop caused a check in the sum of $417,359.01 to be drafted from an account of which he was the sole owner.

---

[7] The account number is not given in accordance with existing court policy regarding bank records and the like.

20.  On August 1, 2007, Pop and Diane deposited the $417,359.01 check in a Park Sterling Bank account owned by the Trust.

21.  On August 2, 2007, Pop filed a voluntary dismissal without prejudice of the North Carolina lawsuit regarding the $230,000.00 Note.

22.  Pop never re-filed the North Carolina lawsuit.

23.  On August 2, 2007, George told Diane to withdraw $412,000.00 from the Park Sterling Bank account and provide the funds to him.

24.  Diane did as George directed and the $412,000.00 was deposited into a joint account belonging to both George and Diane. The account was tied to a line of credit secured by their home.

25.  There was no contemporaneous documentation about the $412,000.00 other than noting it as a "withdraw" in the account's hand-written ledger.

26.  On April 24, 2008, Pop executed a Second Amendment modifying his Trust, but leaving Diane as the sole Trustee.

27.  Pop died on February 3, 2009.  No steps were taken by any family member to open or probate the Estate.

28.  After Pop's death, George, personally or through Superior Tile, began paying the mortgage on the Horseshoe House. He made a total of 43 payments of $1,289.56 between Pop's death and September of 2012.  This totals $55,451.08 paid for benefit of the Trust.

29.  On August 31, 2009, George sent Linda a letter advising her that he expected her to begin paying the Horseshoe House mortgage by September of 2010.

30.  On May 4, 2012, Mary wrote Diane a letter requesting an inventory of assets in Pop's Estate and Trust.

31.  On August 22, 2012, over three years after Pop's death, Mary and Linda filed a petition in Lancaster County, South Carolina Probate Court seeking their appointment as personal representatives of Pop's Estate.[8]

32.  On May 2, 2013, with the consent of Mary, Linda, and George, the Probate Court appointed Plaintiff Desa Ballard ("Ballard") as the Personal Representative of the Estate and ordered her to file an inventory of the Estate by July 31, 2013.

33.  On July 23, 2013, Regions Bank commenced a foreclosure action on the Horseshoe House.  Bridgmon, an attorney Diane hired for the Trust, consented to the foreclosure. Bridgmon acted to accelerate the foreclosure proceedings.

34.  On August 20, 2013, Peter J.  Nosal ("Nosal"), counsel of record for Mary and Linda, sent an email to Ballard suggesting that the dispute between the siblings would settle only if Ballard included a claim on the inventory that Pop still had an interest in Superior Tile, signifying that George was not the sole owner.

35.  On September 9, 2013, Mary, Linda, George, and Diane agreed to the substitution of Ballard for Diane as Trustee.

36.  On October 18, 2013, Ballard issued the inventory for the Estate, which included, as assets of the Estate, stock in Superior Tile and the $230,000.00 Note.

---

[8]  The original will could not be located, but the Probate Judge accepted a photocopy.

37. On November 5, 2013, George and Diane filed an action in Mecklenburg County, North Carolina seeking the removal of Ballard as Trustee.

38. On November 5, 2013, George and Diane filed an action in Mecklenburg County, North Carolina seeking a declaratory judgment that George owned the entirety of Superior Tile.

39. On November 11, 2013, Ballard filed an action against Diane in Lancaster County, South Carolina alleging that Diane had breached her fiduciary duties as Trustee.

40. The Horseshoe House was scheduled to be sold at a foreclosure sale on or about December 2, 2013. Ballard promptly acted to set aside the foreclosure. She was successful in this effort, thereby preserving one of the Trust's assets.

41. On December 31, 2014, the Mecklenburg County Superior Court issued a declaratory judgment that George is the sole shareholder of Superior Tile.

42. Diane admitted that, on November 8, 2007, there was a Certificate of Deposit ("CD") on deposit at First Citizens Bank that was part of the Trust. The parties referred to it as "the $50,000 CD," but Ballard's testimony was that the amount of the CD was actually $49,564.09. Acknowledging her signature on the check used to purchase the CD, Diane professed not to know what happened to this money. When pressed further, she responded, "The paper trail would know where it is." When asked about the existence of the paper trail, Diane once again said, "I've given them to my lawyer." Yet it is undisputed that no such paper trail was furnished during discovery or in response to this Court's keeping the record open after trial to allow such records to be produced.

43.  As noted previously, George, Diane, Linda, and Mary eventually agreed to allow Ballard, a widely respected South Carolina attorney with a forensic accountant on her staff, to serve as both Personal Representative of the Estate and as Successor Trustee to the Trust. Regarding payment to Ballard, the Appointment Agreement provides:

> The Beneficiaries shall compensate Ballard and her staff for her service as Successor Trustee under the terms of the Trust documents at their regular hourly rate.  To the extent either the Estate of Chris Combis or the Revocable Trust of Chris Combis do not contain sufficient funds to fully compensate Ballard and her staff for Ballard's services as Successor Trustee, each Beneficiary shall be responsible for one-third of the compensation due Ballard and her staff earned as Successor Trustee.

44.  Testimony at trial indicated that the agreement to pay Ballard at her standard hourly rate (instead of the statutory amount for fiduciaries in South Carolina which is generally five percent of the liquid assets) was based upon the assumption that an hourly fee payment would have been less than the statutory percentage.  Quite obviously, no party to the Appointment Agreement foresaw the controversies and disagreement that lay ahead.

45.  Now, after years of litigation, various parties ask this Court to re-allocate the fees due Ballard and to take into account what are said to be inappropriate or frivolous positions taken by various other parties, which served to drive up Ballard's fees unnecessarily. Additionally, George and Diane take the position that the overall fee request itself is excessive and should be reduced by the Court, irrespective of any re-allocation of the parties' agreement.

46.  It should be noted at the outset that the plain language of the Appointment

Agreement provides that each of the three Combis children (George, Linda, and Mary) would bear one-third of Ballard's fees. The document does not contain a provision allowing for a re-allocation of the fees based upon later vexatious litigation. Nor does the agreement provide for later judicial review of the fees for excessiveness.

47. Thus, the Court's initial inclination was to strictly interpret the agreement and leave the parties in the position they contractually agreed to: One-third of Ballard's fees to be paid by each child, with no judicial review for excessiveness.[9]

48. Upon due reflection, however, the Court is now persuaded that some modification of the fees is appropriate. This is based primarily upon the covenant—implied by law in both South Carolina and North Carolina—of good faith and fair dealing in the execution of contracts. (See Conclusion of Law No. 4). Therefore, for the reasons which follow, the Court will adjust the amount due to Ballard by the parties to these cases.[10]

**A. Objections**

49. The Court has reviewed and examined the entries of Ballard's time sheets. In addition, the Court has reviewed the specific and general objections made by George and Diane and evaluated their claim that Ballard's fees are excessive and unreasonable.

50. Based upon the evidentiary hearing, Ballard's time sheets, and the objections

---

[9] The Appointment Agreement states the beneficiaries—George, Linda, and Mary—will contribute one-third each to compensate Ballard and her staff for services rendered as Successor Trustee to the extent either the Estate or Trust do not contain sufficient funds to do so.

[10] The remaining outstanding fees are to be compensated in accordance with the Appointment Agreement.

made by George and Diane, the Court agrees that a portion of Ballard's fees are overstated with regard to the unsuccessful effort to assert an estate ownership in Superior Tile. Therefore, this portion of her fees shall be reduced by twenty-five hours at Ballard's hourly rate of $400.00, resulting in a $10,000.00 reduction of fees due. The Court finds that all other aspects of Ballard's fees (although some fees may have been categorized differently) were reasonable.[11]

51. The Court will discuss the reduction of fees due to Ballard's attempt to re-litigate the question of personal jurisdiction in the stock ownership litigation *infra*.

## B. The Initial Transfer of the Estate Checking Account

52. Ballard was appointed Successor Trustee of the Trust in September 2013. Immediately upon her appointment, she sought to gain possession of the $3,174.27 in the Estate checking account from her predecessor, Diane, or Diane's attorney, Bridgmon. In a clear testament to the acrimony between the family members, it took Ballard the better part of two years to accomplish this task.[12]

53. Ballard's records and testimony reflect that she incurred fees totaling $4,717.50 on this aspect of the litigation,[13] and the Court finds these fees to be reasonable.

---

[11] The Court recognizes that the attorney's fees for Ballard's counsel in North Carolina are not before it, but the Court takes this opportunity to state that it is troubled by the North Carolina counsel's fees and, based upon its knowledge of the case, believes the North Carolina counsel's fees to be excessive.

[12] It should be emphasized that the misbehavior by George and Diane occurred while one or more of their previous attorneys represented them. None of it occurred under the watch of present counsel, David G. Redding.

[13] On this and all subsequent fee calculations, the Court has carefully examined the time sheets and (continued...)

Accordingly, George and Diane must jointly and severally bear this portion of Ballard's fees.

**C**. **The Horseshoe House Foreclosure Set Aside**[14]

54.  As noted previously, one of the Trust assets was a residence located on Horseshoe Road in Lancaster County, South Carolina in which Linda, Mary, and (for a short time before his death) Pop resided.

55.  On July 23, 2013, before Ballard was appointed and while Diane was still Trustee, Regions Mortgage had commenced a foreclosure action upon the Horseshoe House. Diane, in her capacity as Trustee, retained Bridgmon to represent the Trust and defend the foreclosure. Bridgmon also represented George who had signed the mortgage.

56.  Ballard and Nosal (counsel for Linda and Mary) asked Bridgmon about the foreclosure, but he never forwarded the pleadings or otherwise provided information regarding the foreclosure.

57.  Bridgmon did not file an answer on behalf of either defendant, and a default judgment was entered on the foreclosure claim by Regions Mortgage. Bridgmon attended the mortgage foreclosure hearing on October 14, 2013, before Lancaster County Special

---

[13](...continued)
approved the time submitted by Ballard, marked as "Plaintiff's Exhibit 268." The Court also finds the hourly rate for the attorneys and support personnel to be reasonable.

[14]  The foreclosure set aside claim was initially asserted by Linda and Mary in a state court action. George did not timely respond and, thus, was in default on that claim while it was pending in state court. Linda and Mary then intervened in the actions before this Court to once again assert their foreclosure set aside claim. Present counsel for George (who was not the attorney who represented George in the state court action) conceded that George is in default on this particular component of the Ballard fee dispute issue; but insisted that George had a right to participate in the hearing on damages as to this claim. Even if George were not in default on this claim, the Court would have found against him on the liability question.

Referee Philip Wright.  Bridgmon consented to foreclosure at the hearing and a foreclosure sale date was set for December 2, 2013.  Because the defendants were in default, no appearance by Bridgmon was necessary.  However, by appearing and consenting to the foreclosure, Bridgmon assisted Diane and George in furthering George's plan to purchase the Horseshoe House.[15]

58.  After consenting to the foreclosure and the issuance of a foreclosure order for the Horseshoe House, Bridgmon delivered to Ballard the fully executed Successor Trustee Agreement signed by George, Diane, Linda, and Mary, and their respective counsel, consenting to Diane's resignation as Trustee and appointing Ballard as Successor Trustee. Bridgmon did not tell Ballard that the foreclosure hearing had occurred.

59.  Upon her receipt of the fully executed Successor Trustee Agreement, Ballard signed it on October 15, 2013, and assumed the duties of Successor Trustee.  Bridgmon provided her with a copy of the foreclosure complaint on October 8, 2013,[16] but failed to respond to her inquiry as to the status of the foreclosure.

60.  Upon becoming Successor Trustee, Ballard learned that the Horseshoe House was scheduled to be sold at a foreclosure sale on December 2, 2013.  Ballard filed appropriate pleadings and was successful in setting aside the foreclosure and negotiating a reinstatement

---

[15] George apparently wanted to purchase the Horseshoe House at the foreclosure sale to give him more leverage with Linda and Mary who were residing there at the time.

[16] The Successor Trustee Agreement recites that Ballard would assume her duties as of September 9, 2013.  However, Ballard testified that she did not have any authority to act as Successor Trustee until a written agreement was executed to that effect.  The Trust Agreement expressly prohibits a successor trustee from acting until delivery of a written instrument executed by those with power of appointment to that effect. Article XI, Section 4.

of the mortgage. The Special Referee found that Ballard had a meritorious defense to the foreclosure.

61.   With no funds in the Trust available, Ballard elected to sell another property owned by the Trust, i.e., Mary's house on Lochridge Road in Charlotte, North Carolina, in an attempt to reinstate the mortgage on the Horseshoe House.  It took Ballard several months, but she sold the Lochridge House and was able to reinstate the mortgage on the Horseshoe House.  At the time, both Linda and Mary lived in the Horseshoe House.

62.  Had Diane not breached her fiduciary duty (See Conclusion of Law No. 2), she would have had the funds available to pay the Horseshoe House mortgage.  Alternatively, Diane should have answered the foreclosure action and asserted a meritorious defense. Instead, she (through her husband and her then-attorney, Bridgmon) actively assisted in allowing the Horseshoe House to go into foreclosure, apparently because George planned to purchase the property at the foreclosure sale to give him more direct control of Linda and Mary.  In doing so, Diane would have abandoned the considerable equity that existed in the Horseshoe House, at a significant disadvantage to the Trust.

63.   Ballard incurred additional fees as Successor Trustee that were a direct and proximate result of her efforts to set aside the Horseshoe House foreclosure, market and sell the Lochridge House, and reinstate the mortgage on the Horseshoe House.  These efforts were made necessary by Diane's breach of her fiduciary duty and George's breach of the covenant of good faith and fair dealing implied in the Appointment Agreement.

64.  Ballard and her support personnel incurred fees totaling $40,500.00 on this aspect

of the litigation and the Court finds this sum to be reasonable. This fee is allocated to George and Diane, jointly and severally.

### D. The North Carolina Litigation

65. Two actions were initiated by George and Diane in North Carolina: a lawsuit to have Ballard removed as Successor Trustee and a declaratory judgment action regarding ownership of the stock in Superior Tile. These suits will be addressed separately.

### (I) The Effort to Remove Ballard as Successor Trustee

66. Shortly after Ballard was appointed, the acrimony between the family members began. This led to a lawsuit filed by George and Diane in North Carolina state court to have Ballard removed as Successor Trustee. Although the Appointment Agreement had required that all litigation occur in South Carolina, George and Diane took the position that because the Trust was a North Carolina trust, litigation regarding the status of the Trustee had to occur in that jurisdiction. George and Diane were unsuccessful in this effort.

67. The North Carolina court obviously found that there was no basis for removing Ballard as Successor Trustee. On the record before it, this Court finds that Ballard's actions had, in all material respects, been part of the duties incumbent upon her as Personal Representative and Successor Trustee. Accordingly, Ballard and her support personnel incurred fees totaling $9,395.00, and the Court finds this sum to be reasonable. This fee shall be allocated against George and Diane, jointly and severally.

### (II) The Declaratory Judgment Regarding Ownership of Superior Tile

68. As indicated previously, after investigating precisely who owned the stock in

21

Superior Tile, Ballard formed a good faith belief that a credible claim could be made that Pop

owned up to 20 shares of the company at his death.  For this reason, Ballard included an entry

on the Inventory and Appraisal of the Estate reflecting this stock ownership interest.  George

and Diane then filed a declaratory judgment action in North Carolina seeking a determination

from the North Carolina state court that George was the exclusive owner of Superior Tile.

He was successful in this effort.

69.  Although Ballard lost on this issue in the North Carolina litigation, this Court has

determined  that  her  position  taken  there  was  reasonable  under  the  circumstances.

Accordingly,  Ballard  and  her  support  personnel's  reasonably  incurred  fees  (totaling

$29,611)[17] should be borne pursuant to the Appointment Agreement.

70.  A different result occurs, however, regarding Ballard's position in the litigation

before this federal court.  After she lost in the stock ownership litigation in North Carolina,

Ballard attempted to raise that issue once again before this Court.  On several occasions, this

Court observed that the principle of res judicata would apply and that this Court would not

revisit the stock ownership issue, which had already been resolved in North Carolina state

court.  Ballard,  through  her  counsel,  responded  that  the  North  Carolina  court  lacked

jurisdiction over her, and the jurisdiction issue could be litigated here.  Upon learning that

Ballard  had  raised  and  lost  the  personal  jurisdiction  issue  in  North  Carolina,  this  Court

opined on several occasions that the proper remedy would have been to file an appeal in the

---

[17] The Court has used Ballard's time sheets to compute the total, but has reduced the total to account for a double entry ($160.00) on June 3, 2014, and the amount of fees found to be excessive ($10,000.00) and unreasonably re-litigated ($4,000.00) with regard to this issue.

North Carolina action, rather than to seek to re-litigate jurisdiction in this Court. Nevertheless, Ballard persisted in attempting to re-litigate the issue in this action. The Court on several occasions expressed its tentative conclusion that the personal jurisdiction issue was ended and ultimately invited the parties to brief the issue. Upon receipt of the briefing, the Court announced orally at a pretrial conference, held shortly before trial, that the doctrine of res judicata prevented re-litigation of that issue here. Although Ballard's counsel later indicated that Ballard was prepared to concede that the stock ownership issue was indeed ended in North Carolina, the concession comes too late. For this reason, the Court will disallow fees to Ballard for the time reasonably expended on briefing and arguing the res judicata issue in this Court. Ballard's time reasonably spent on this issue was ten hours[18] and, applied to her hourly rate of $400.00, yields a total of $4,000.00. Ballard shall not be allowed to charge the Estate or the Trust for this legal work.

## III.    CONCLUSIONS OF LAW

This Court has jurisdiction over the subject matter of these consolidated actions and over the parties to this litigation.

### 1. The $230,000.00 Note

Because Pop initiated litigation in North Carolina to collect on this $230,000.00 Note, took a voluntary non-suit, and did not reinstate the action within one year or within the three-year statute of limitations for breach of contract, this claim is barred under North Carolina

---

[18] The ten hours disallowed is not specifically separated in Ballard's time sheets, but is based upon this Court's reasonable approximation given the materials submitted to the Court.

law.  *See Robinson v. Gen. Mills Restaurants, Inc.*, 430 S.E.2d 696, 698 (N.C. App. 1993); *Guyton v. FM Lending Servs., Inc.*, 681 S.E.2d 465, 470 (N.C. App. 2009) (holding that Rule 41(a)(1) shall not be used to limit time to one year if general statute of limitations has not expired).

Accordingly, this claim lacks merit and the $230,000.00 Note is unenforceable by operation of North Carolina law.

### 2. The $412,000.00 "Loan" and Related Breach of Fiduciary Duty Claim

The heart of this case lies in Diane's transfer of $412,000.00 on August 2, 2007, from the Trust's Park Sterling Bank account to an account belonging to her and George.  On the one hand, Ballard claims this was a breach of fiduciary duty by Diane and as such, was the "worst breach of fiduciary duty she had ever seen" in her long career. On the other hand, George and Diane contend that this transfer was in fact a "loan" to George from the Trust, which was proper under the Trust Agreement and North Carolina law.  For the following reasons, the Court finds Diane's transfer of $412,000.00 from the Trust into an account owned by her and George to have been a breach of her fiduciary duty and constructive fraud.

### A.    "Loan"

The transfer of $412,000.00 from the Trust Account was not a "loan" to George. This is demonstrated in two ways. First, there is no contemporaneous evidence to suggest the transfer was a loan. Secondly, the money was not given to George, but rather placed into a joint account belonging to both George and Diane, in her personal capacity.

As an initial matter, there is no evidence to indicate the existence of a loan at the time the transfer was made. There was no oral contract, no promissory note, no interest rate, nor any writing whatsoever. Rather, Diane's own testimony reveals that she first considered the transfer a "draw" by George. (Diane Dep. p. 55). The transfer was not characterized as a loan until much later. Hattenhaur, an attorney, appears to be the first person to refer to the transfer as a loan. *Id*. He did so, not in the form of some later memorialization, but rather as a single entry on a ledger in the Trust's accounting. This single notation, coupled with George and Diane's later testimony, is insufficient to prove the transfer was a loan.

Next, the Court finds it instructive to consider where the $412,000.00 went. The transfer was not to George alone. Rather, it was to a joint account belonging to both George and Diane. (Diane Dep. pp. 49–51). Diane, as Trustee, transferred the money into an account belonging to both her and her husband. *Id*. The account was for a line of credit secured by their personal home owned by them jointly. *Id*. The joint ownership of the account weighs heavily against the transfer being a loan to George.

Accordingly, the Court finds that the transfer of $412,000.00 was not a loan.

### B. Breach of Fiduciary Duty and Constructive Fraud

Diane's transfer of the $412,000.00 was a breach of her fiduciary duty[19] and constitutes constructive fraud.

---

[19] "A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928).

In North Carolina, for a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties. *Dalton v. Camp*, 548 S.E.2d 704, 707–08 (N.C. 2001); *Curl v. Key*, 316 S.E.2d 272, 275 (N.C. 1984); *Link v. Link*, 179 S.E.2d 697, 704 (N.C. 1971). Such relationships are broadly defined by courts as those in which,

> there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . , [and] "it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and *resulting domination and influence on the other*."

*Dalton*, 548 S.E.2d at 707–08 (quoting *Abbitt v. Gregory*, 160 S.E. 896, 906 (N.C. 1931)). The statute of limitations for breach of fiduciary duty in North Carolina is three years. *Toomer v. Branch Banking and Trust Co.*, 614 S.E.2d 328, 335 (N.C. App. 2005) ("Allegations of breach of fiduciary duty that do not rise to the level of constructive fraud are governed by the three-year statute of limitations applicable to contract actions contained in N.C. Gen. Stat. § 1-52(1) (2003).").

A plaintiff's claim for constructive fraud must allege: (1) a relationship of trust and confidence; (2) that the defendant took advantage of that position of trust in order to benefit himself; and (3) that plaintiff was, as a result, injured. *Sterner v. Penn*, 583 S.E.2d 670, 674 (N.C. App. 2003). Intent to deceive is not an element of constructive fraud. *Link*, 179 S.E.2d at 704. The primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the constructive fraud requirement that the defendant benefit himself. *White v. Consol. Planning, Inc.*, 603 S.E.2d 147, 156 (N.C. App. 2004). Further, the statute of limitations for constructive fraud is ten years. *NationsBank of N. Carolina, N.A.*

*v. Parker*, 532 S.E.2d 597, 602 (N.C. App. 2000) ("A claim of constructive fraud based upon a breach of a fiduciary duty falls under the ten-year statute of limitations contained in N.C. Gen. Stat. § 1-56 (1999)."); *Baars v. Campbell University, Inc.*, 558 S.E.2d 871, 875 (N.C. App. 2002) ("When determining the applicable statute of limitations, we are guided by the principle that the statute of limitations is not determined by the remedy sought, but by the substantive right asserted by plaintiffs.")

Here, as Trustee, Diane was in a position of trust and confidence with regard to the Trust and its beneficiaries. She took advantage of that position to withdraw $412,000.00 from the Trust's account and deposit it into an account that she and her husband owned jointly. She personally benefitted from that action. Her actions greatly depleted the Trust's resources, and its beneficiaries were injured therefrom.

Accordingly, the Court finds Diane to have been in breach of her fiduciary duty and liable for constructive fraud.[20]

### C.  Actual Damages

In calculating actual damages, the Court first considers the initial amount taken—$412,000.00. In addition, the Court finds that the Trust is entitled to the time value of that money measured from the date of Diane's transfer, at the North Carolina statutory interest rate of 8% per annum. Finally, because Diane transferred that money into a joint account with George and later claimed it was a loan to him and even transferred the money

---

[20]  The Successor Trustee's claim was clearly brought within the ten-year statute of limitations for constructive fraud. As for the shorter, three-year statute of limitations for breach of fiduciary duty, the Court concludes that the statute was tolled while Diane served as Trustee, because the claim was one by herself as Trustee against herself and her husband individually.

at his direction, the Court finds that George and Diane are jointly and severally liable to the Trust for its return.

Accordingly, the Court awards the Trust $412,000.00, plus interest at the North Carolina statutory interest rate (8% per annum) of $299,619.94, resulting in a total of $711,619.94.

However, George or Superior Tile, made payments on the Horseshoe House mortgage totaling $55,451.08, without interest, during the time period between February 2009 and September 2012. These payments inured to the benefit of both Mary and Linda. No explanation was given as to why the payments were made. The Court observes, however, that this was consistent with Pop's actions while he was alive. Pop's generosity, however, did not bind George to continue these payments following his death.[21]

Accordingly, George[22] shall be allowed a setoff for the monies paid on behalf of Linda and Mary, plus statutory interest, computed as follows:

| | |
|---|---|
| Amount Paid: | $55,451.08 |
| Statutory Interest: | $31,696.74 (8% per annum for 91 months)[23] |
| Total Credit Due: | $87,147.82 |

---

[21]  It is not clear whether a claim has been asserted for a setoff, but this Court has the inherent authority to reach a just result. *See Ex parte Dibble*, 310 S.E.2d 440, 442 (S.C. App. 1983) ("Courts have the inherent power to do all things reasonably necessary to insure that just results are reached to the fullest extent possible.").

[22]  At the time of the payments, George was the sole owner of Superior Tile. Therefore, he should be allowed the credit.

[23]  This interest rate was calculated using the effective monthly interest rate of 8% per annum, which required the following formula to be derived: $(1 + .08) ^ (1/12) - 1 = .00643403$. In addition, the amount with interest for each payment was calculated based upon the monthly mortgage payment multiplied by one plus the effective monthly interest rate raised to a power composed of the total number of months since interest began accruing minus the number of months the payment was not earning interest. For example, the following formula was applicable to the first payment made: $1,289.56 x (1+.00643403) ^ (91 - 0)$.

### D. Punitive Damages

Ballard also seeks punitive damages against Diane.  However, the Court, in its discretion, declines to make such an award because, in context, there is no evidence that Diane acted with the requisite aggravating factors such as actual fraud, malice, or willful or wanton conduct to justify the award.

In North Carolina, punitive damages are recoverable in tort actions only where there are aggravating factors surrounding the commission of the tort such as fraud, malice, or willful or wanton conduct.  N.C. Gen. Stat. Ann. § 1D-15(a). Further, the claimant must prove the existence of an aggravating factor by clear and convincing evidence. N.C. Gen. Stat. Ann. § 1D-15(b).

While Diane's actions here were wrong, in the context of this case and this family, they do not rise to the level of the aggravating factors sufficient to justify punitive damages.

First, the Court finds that Diane did not commit actual fraud.  Specifically, the Court finds that she did not act with any intent to deceive any of the beneficiaries or the settlor. Notably, Pop was still living when this transfer was made. In fact, he lived for another year and a half, at least part of that time with Linda. Further, the transfer was made within forty-eight hours of his deposit of $417,359.01 into the Trust account. Importantly, the evidence showed that Diane accompanied Pop in making that deposit. Further still, twenty-four hours before the transfer, Pop voluntarily dismissed a lawsuit against George and Diane.  Because there is no evidence Diane did anything to hide the transfer from Pop and because he lived

for another eighteen months after it, the Court draws the inference that Pop likely knew of the transfer. This knowledge dispels the notion that Diane had any intent to deceive anyone.

Secondly, the Court finds that Diane did not act with malice. This family and Superior Tile both have a long history of irregular financial transactions. All family members used Superior Tile's money for personal expenses from time to time. George and Superior Tile often paid the mortgage for the Horseshoe House on behalf of the Trust. Superior Tile supplied cars for all family members. Pop used a Superior Tile credit card for his personal expenses. Money often changed hands between the family members without any accurate records being kept. Thus, the Court finds it hard to find any malice on the part of Diane whose behavior was "par for the course" for their family. Diane's conduct was not inconsistent with the way in which Pop had moved money back and forth while he was alive.

Finally, the Court finds that Diane did not act willfully or wantonly in transferring the money. Diane had no training as a trustee or fiduciary. In fact, her only instruction as to the duties of a trustee consisted of one meeting with an estate lawyer, Hattenhaur. If Diane had some formal training or experience that might suggest a better comprehension of the issues involved, her conduct may have been more culpable.[24]

Accordingly, the Court declines to make an award of punitive damages.

### 3.  The $49,564.09 Missing Certificate of Deposit

The Trustee at the time (Diane) had a fiduciary duty to preserve and account for all assets in the Trust.  Because she admits that there was, at one time, a CD for $49,564.09 that

---

[24]  As noted earlier, Diane was given a book outlining the duties of a trustee.

she cannot account for, she must be required to return this amount, plus interest at the North Carolina statutory interest rate (8% per annum) of $34,980.03, resulting in a total of $84,544.12 that she must return to the Trust.

### 4. The Allocation of Desa Ballard's Fees as Trustee of the Trust

Mary and Linda assert a claim—styled as one for fraud—against George and Diane for "facilitating and accelerating" the Horseshoe House foreclosure proceeding. They also take the position that they should not be required to pay their one-third share of Ballard's fees incurred in various proceedings when George and Diane took unreasonable positions. Additionally, George and Diane challenge the amount of overall fees sought by Ballard and seek to have the Court review her time sheets for excessiveness.

As noted in the Findings of Fact portion of this Order, the Court has, albeit reluctantly, determined that it should delve into the questions of Ballard's fees.[25]  In this Court's view, however, the fee issue is not properly asserted as one for common law fraud. Rather, the fee dispute is more properly viewed as a claim arising out of the agreement appointing Ballard as Successor Trustee.

Both North Carolina and South Carolina imply a covenant of good faith and fair dealing in every contract. *Governors Club, Inc.  v.  Governors Club Ltd.  P'ship*, 567 S.E.2d 781, 789 (N.C. App. 2002), *Williams v. Riedman*, 529 S.E.2d 28 (S.C. App. 2000).

---

[25]  The Court was initially inclined to leave the fee determination for the Probate Court. However, Ballard's fees for her work as Trustee are outside the Probate Court's jurisdiction.  Moreover, a proper allocation of her fees involves a comprehensive examination of all of the many disputes between the parties—disputes with which this Court is now intimately familiar.

Consequently, this Court has the authority to re-allocate the fee distribution for Ballard's fees as Successor Trustee of the Trust and also review her fees for overall excessiveness. For this reason, her fees are reduced and allocated among the parties as set out in Findings of Fact Nos. 48 through 70.

Any claims, counterclaims, and cross-claims not addressed in this Order fail on their merits because of the failure of the party asserting the claim to meet his or her burden of proof.

## IV.    CONCLUSION

In accordance with the foregoing, judgment shall be entered by the Clerk as follows:

1.   On the breach of fiduciary duty claim: George Combis and Diane Combis are jointly and severally indebted to the Chris Combis Revocable Trust in the amount of $412,000.00, plus interest at the North Carolina statutory interest rate (8% per annum)[26] of $299,619.94, resulting in a total of $711,619.94.

2.   On the missing Certificate of Deposit claim: Diane Combis as Trustee is individually liable to the Chris Combis Revocable Trust in the sum of $49,564.09, plus interest at the North Carolina statutory interest rate (8% per annum) of $34,980.03, resulting in a total of $84,544.12.

3.   On the setoff for monies paid for the benefit of Mary Combis and Linda Combis: Mary Combis and Linda Combis are jointly and severally indebted

---

[26] All interest awards are calculated to the date of entry of this Order (September 1, 2016). Past judgment interest shall run at the federal statutory rate.

to George Combis and Superior Tile, Marble, and Terrazzo, Inc., in the sum of $55,451.08, plus interest at the North Carolina statutory interest rate (8% per annum) of $31,696.74, resulting in a total of $87,147.82.  Accordingly, George Combis may deduct or setoff for this sum from the total amount he is obligated to pay by nature of this Court's Order.

4.    Desa Ballard shall reduce her fee, and not charge any party, in the amount of $10,000.00 regarding excessive fees incurred in the stock ownership litigation and $4,000.00 regarding fees incurred in attempting to re-litigate the personal jurisdiction question (presented in the North Carolina stock ownership litigation) in this Court for a total reduction of $14,000.00.

5.    Of the total Probate and Trustee fees charged to the Estate and the Trust, respectively, by Desa Ballard, George Combis and Diane Combis shall be jointly and severally responsible for payment of the following sums:

a.    $4,717.50 for the effort to transfer funds in the Trust Account into Ballard's name;

b.    $40,500.00 on the work performed on the foreclosure set aside issue; and

c.    $9,395.00 on the defense of the effort to have Ballard removed as Personal Representative and Trustee.

6.    In all other respects, the parties are bound by their agreement regarding Desa Ballard's fees, i.e. one-third each for Trustee fees and one-half to George Combis and one-half to Linda Combis and Mary Combis for Personal Representative fees.

7.    As to all other claims and issues presented in this case, judgment shall be entered for the defendant or defendants.

Judgment shall be entered in accordance with this Order.

IT IS SO ORDERED.

_Joseph F. Anderson, Jr_

September 1, 2016                              Joseph F. Anderson, Jr.
Columbia, South Carolina              United States District Judge

34